JUNAKIN *v.* KUYKENDALL.

No. 41149          September 28, 1959          114 So. 2d 661

*James Stone & Sons, T. H. Freeland,* Oxford, for appellant.

*McClure, Fant & McClure,* Sardis, for appellee.

KYLE, J.

The appellant, Lloyd Junakin, plaintiff in the court below, filed suit against the appellee, T. R. Kuykendall, defendant, in the Circuit Court of Yalobusha County, for the recovery of property damages alleged to have been sustained by the appellant as a result of an automobile accident which occurred on U. S. Highway No. 51 on June 29, 1957, when the appellant's 1957 Oldsmobile collided with the appellee's Ford pickup truck at a point on the highway near Oakland, Mississippi.

The plaintiff alleged in his declaration that the plaintiff, accompanied by his brother-in-law, John Roberts, and the plaintiff's sister, Leora Roberts, were proceeding southwardly along U. S. Highway No. 51 in the plaintiff's 1957 model Oldsmobile enroute from Milwaukee, Wisconsin, to the City of New Orleans at the time of the accident; that the plaintiff's car was being operated prudently and had just come over a slight rise in said highway about one-eighth or one-tenth of a mile north of the intersection of U. S. Highway No. 51 and Mississippi State Highway No. 32; that just before the plaintiff's car reached the intersection the truck of the defendant which had come to a full stop at the intersection, suddenly and without warning, pulled out into Highway No. 51 and into plaintiff's lane of traffic; that

plaintiff's driver immediately applied his brakes but was unable to avoid colliding with the truck because of the close proximity of the plaintiff's car to the intersection at the time the defendant drove his truck into the intersection. The plaintiff alleged that the left front fender of his car struck the right rear fender of the defendant's truck, and the plaintiff's car was greatly damaged as a result of the collision. The plaintiff asked for a judgment against the defendant for the sum of $1,-224.74.

The case was tried before a jury at the July 1958 term of the court, and the jury returned a verdict for the defendant. The plaintiff's motion for a new trial was overruled, and final judgment was entered in favor of the defendant. From that judgment the plaintiff prosecutes this appeal.

The main points argued by the appellant as grounds for reversal of the judgment of the lower court are: (1) That the court erred in refusing to grant a peremptory instruction on the issue of liability requested by the appellant, and (2) that the court erred in overruling the appellant's motion for a new trial on the ground that the verdict of the jury was against the overwhelming weight of the evidence. In view of the nature of the appellant's assignments of errors, it is necessary that we give a more detailed statement concerning the highway intersection where the accident occurred, and a brief summary of the evidence offered on behalf of the respective parties.

The record shows that State Highway No. 32 intersects U. S. Highway No. 51 from the east at a point just outside the corporate limits of the Town of Oakland. Both highways are paved highways, the pavement on U. S. Highway No. 51 at the point of intersection being a concrete pavement 20 feet wide, and the pavement on State Highway No. 32 being a blacktop pavement 18 feet wide. There are fan-like aprons

or flares along the east side of the intersection, which provide easy approaches into the through highway for motorists entering the highway from the east and a clear view of the highway toward the north and toward the south. From the photographs found in the record it appears that the highway is straight for a distance of several hundred yards on each side of the intersection. The roadbed appears to be practically level for a considerable distance north of the intersection, but rises gradually as it approaches the crest of a hill several hundred feet north of the intersection. The testimony shows that, at the time of the accident complained of in this case, there was a stop sign on State Highway No. 32 which was located approximately 81 feet east of the highway intersection, and an intersection marker or warning sign on U. S. Highway No. 51, located on the west side of the highway several hundred feet north of the intersection and clearly visible to motorists approaching the intersection from the north.

The plaintiff, Lloyd Junakin, testified that he lived in Milwaukee, Wisconsin, and worked in the electric department of Allis Chalmers, Incorporated; that he and his brother-in-law, John Roberts, and his sister, Leora Roberts, had left their home near Milwaukee Friday afternoon, June 28, 1957, and were enroute to the City of New Orleans at the time of the accident, which occurred about 9:45 A. M. Saturday morning. They were traveling in a 1957 Oldsmobile which the plaintiff had purchased during the preceding winter. John Roberts was driving the car at the time of the accident, and Leora Roberts was riding on the front seat with him. The plaintiff was riding on the back seat and was asleep when the car collided with the defendant's truck. The plaintiff was thrown from the back seat as a result of the impact. The car came to a stop on the right-hand side of the highway going south. The left front fender was badly damaged as a result of the impact. The truck appeared to have been hit on the right rear fender.

John Roberts testified that he lived in Milwaukee; and that he and his wife and the plaintiff had left Milwaukee about 6 o'clock in the evening and had been on the road about 16 hours at the time the accident occurred. He had driven part of the time and the plaintiff had driven part of the time. He stated that he had taken over the driving soon after they left Memphis. The weather was clear and the road was dry. He was driving at a rate of speed about 50 to 55 miles an hour as he approached the intersection where the accident occurred. He saw Mr. Kuykendall's truck when he came down the hill several hundred feet north of the highway intersection. The truck came up to Highway No. 51 and stopped pretty close to the highway. Roberts stated that he kept his same speed, and as he got in the intersection Mr. Kuykendall "pulled off." Roberts applied his brakes but hit the rear right fender of the truck. Roberts stated at first that Kuykendall never got over in the west lane; but he said later that Kuykendall's car was "At an angle when I hit him. * * * He was mostly over the yellow line." He was asked, "Where did you car hit his truck?" His answer was, "Rear fender, to the right." Roberts stated that he remembered seeing the intersection after he came over the hill, but he did not see the road sign which showed that he was approaching a highway intersection. He stated that he was half way down the hill when he first saw the truck, which came to a dead stop at the intersection. He did not think the man in the truck saw his car. Roberts stated that the speed limit through Illinois was 60 to 65 miles per hour; but when they were in Mississippi they drove at a rate of speed of 50 to 55 miles per hour, and he kept the same speed when he approached the intersection. Leora Roberts, who was riding on the front seat of the car with her husband, testified that she saw the truck when they came over the hill. She was not sure whether the truck was standing still or moving.

James D. Watts, a member of the State Highway Patrol, testified that he arrived at the scene of the accident about 30 minutes after the accident occurred. He found an Oldsmobile in the west lane of traffic close to the center line of the highway, and a pickup truck on the right of way east of the south end of the intersection. The Oldsmobile left no marks on the pavement. Watts stated that there was a stop sign on Highway No. 32 near the intersection.

Henry Ivy, a civil engineer who lived at Oxford, Mississippi, testified that he had inspected the highway intersection where the accident occurred and had taken measurements of distances. He stated that the distance from the stop sign on Highway No. 32 to the concrete pavement on Highway No. 51 was 81 feet. The length of the apron or flare along the east side of the highway intersection was 185 feet. The distance from the stop sign to the fartherest point north on Highway No. 51 where a motorist could see a car was 870 feet. Bushes and other obstructions made it impossible to see beyond 870 feet up the hill. From the edge of the pavement on Highway No. 51, at the intersection, a man seated in his car could see 1125 to 1150 feet to the top of the hill. Ivy stated that a car proceeding across Highway No. 51 into the right lane of the highway going to Oakland would travel about 50 feet. Ivy stated that a car running at a rate of speed of 50 miles per hour would travel 73 feet per second. A car running at a rate of speed of 55 miles per hour would travel 80.3 feet per second. On cross-examination Ivy stated that a motorist stopping just east of the intersection of U. S. Highway No. 51 and State Highway No. 32 could see northwardly approximately 800 feet.

The only other witness who was called to testify for the plaintiff was Orleen Lilly, who worked for Oliver Lilly Motor Company at Grenada. Lilly identified the repair order, which showed the nature and cost of

the repairs made on the plaintiff's car after the accident.

The defendant, T. R. Kuykendall, testified that he owned land near the intersection of State Highway No. 32 and U. S. Highway No. 51, which is only a short distance from the town of Oakland, and had lived there all his life. He was going into town in his pickup truck when the accident occurred. He stated that he stopped at the highway intersection, 15 or 20 feet east of Highway No. 51, and looked south and north before proceeding into the intersection. He had a clear view of the highway and saw the appellant's car coming over the hill about 1000 feet north of the intersection. He had plenty of time to cross over the intersection, and he started across, driving in second gear, and was angling toward the south when he was hit, and he estimated that it took eight or ten seconds to pass over the intersection. The appellant's car was in the south part of the intersection and in the west lane of traffic when it hit him. He said he did not know at what rate of speed the car was traveling, "75 or 70, I couldn't say." In his opinion it was going over 60 miles per hour. On cross-examination the witness stated that, when he arrived at the intersection, he looked to the south first and then to the north, and when he looked and saw to the north he started going across. He did not watch the car as he pulled out.

As stated above, the main points assigned and argued by the appellant's attorneys as grounds for reversal of the judgment of the lower court are: (1) That the court erred in refusing to grant the appellant's request for a peremptory instruction on the issue of liability; and (2) that the court erred in overruling the appellant's motion for a new trial on the ground that the verdict of the jury was against the overwhelming weight of the evidence. But we think there was no error in the court's refusal to grant the peremptory

instruction requested by the appellant or in overruling the appellant's motion for a new trial on the ground that the verdict was against the overwhelming weight of the evidence.

Section 8197 (a), Code of 1942, provides as follows:

"(a) The driver of a vehicle shall stop as required by this Act at the entrance to a through highway and shall yield the right of way to other vehicles which have entered the intersection from said through highway or which are aproaching so closely on said through highway as to constitute an immediate hazard, but said driver having so yielded may proceed and the drivers of all other vehicles approaching the intersection on said through highway shall yield the right of way to the vehicle so proceeding into or across the through highway."

In Jones v. Carter (1942), 192 Miss. 603, 7 So. 2d 519, the Court said:

"Sections 70 (a), 72 (a) and 73 of Chapter 200, Laws of 1938, requiring the driver of a vehicle to stop at the entrance to a through highway and yield the right of way to other vehicles which have entered the intersection from said highway or which are approaching so closely from said through highway as to constitute an immediate hazard have no application to a case where the driver of a vehicle comes to the entrance to a through highway and has entered into the intersection before it has been entered by a vehicle from said through highway or has entered thereon before a vehicle on the through highway has approached so closely as to constitute an immediate hazard. * * * In other words, the statute of 1938, supra, does not require the driver of a vehicle who has already entered onto an intersection with a through highway to yield the right of way to an approaching vehicle which has neither entered the intersection nor approached so closely

thereto from said through highway as to constitute an immediate hazard. This is likewise true as to a vehicle about to enter or cross a through highway from a private road or driveway.''

In discussing the duty of a motorist approaching a highway which is protected by stop signs to yield the right of way, the text writer in 5A Am. Jur. 433, Automobiles and Highway Traffic, par. 327, says:

''The duty to yield the right of way does not mean that the driver on the unfavored highway must refrain from crossing the favored thoroughfare whenever another vehicle is approaching thereon regardless of how far distant. It is frequently provided by statute that a motorist approaching a highway which is protected by stop signs must yield the right of way to vehicles approaching so closely as to constitute an immediate hazard, the question whether a particular vehicle constituted such a hazard in a particular case being one for the jury.'' See also cases cited.

In discussing the same subject in a very exhaustive annotation which appears in 164 A. L. R. at page 24, the text writer says:

''The conception that a motorist on a road protected by stop signs has the right of way over motorists on intersecting subordinate streets does not mean that the latter, having stopped at the stop sign, must refrain from crossing the favored street whenever another vehicle is approaching thereon, no matter how far distant.

''Where, as is frequently the case, applicable statutes provide that, having come to a stop, a motorist approaching an intersection protected by stop signs must yield the right of way to vehicles approaching on the favored street or highway so closely as to constitute an immediate hazard, but having so yielded, may proceed across the inter-

section in preference to other drivers on the through thoroughfare, such enactments control, and the motorist confronted by a stop sign may, exercising reasonable care, proceed over the crossing after he has stopped and yielded the right of way to such vehicles on the through road as constituted an 'immediate hazard,' the question whether a particular vehicle constituted such a hazard in a particular case being one for the jury.''

■■■ ■ It is not claimed that the appellee in this case failed to stop at the entrance to the through highway, or that the appellant's vehicle had entered the intersection at the time the appellee brought his vehicle to a stop at the intersection. The only disputed question of fact which had to be determined from the evidence was, whether, at the time the appellee entered the intersection, the appellant's vehicle was approaching so closely on the through highway as to constitute an immediate hazard. On that issue of fact there was a sharp conflict in the testimony of the appellee and the testimony of the driver of the appellant's car; and the court, in our opinion, very properly left that issue for the jury to decide. The jury decided the issue in favor of the appellee; and we think that it cannot be said that the verdict of the jury was contrary to the overwhelming weight of the evidence.

The jury had a right to believe the appellee's testimony that he stopped 15 to 20 feet from the edge of the highway; and when he looked and saw the appellant's car coming over the hill to the north, about 1000 feet away, he started going across. And the jury had a right to disbelieve Robert's statement that the appellee stopped at the highway intersection and sat there for a while, and then ''pulled off'' onto the highway after Roberts had arrived at the intersection. According to Robert's own testimony the truck had proceeded at an agle across the highway and was mostly over the

yellow line at the time it was hit. From these facts the jury had a right to conclude that the appellee started across the highway when the appellant's car was still several hundred feet north of the intersection, and that Roberts failed to keep a proper lookout after he saw the appellee's truck at the intersection. Roberts admitted that he did not reduce his speed as he approached the intersection, as required by Section 8176 (b), Code of 1942, after he saw, or should have seen, the appellee's truck enter the intersection; and the highway patrolman testified that there were no skidmarks or other signs on the pavement to indicate that Roberts had applied his brakes before his car collided with the truck.

The appellant's attorneys have cited in their briefs the following cases in support of their contention that the court erred in refusing to grant the appellant's request for a directed verdict: Avent et al. v. Tucker, et al. (1940), 188 Miss. 207, 194 So. 596; Trewolla v. Garrett (1946), 200 Miss. 563, 27 So. 2d 887; Meo v. Miller (1956), 227 Miss. 11, 85 So. 2d 568, and Wells v. Bennett (1956), 229 Miss. 135, 90 So. 2d 199.

But the factual situation in each of those cases was entirely different from the factual situation disclosed by the record in this case, and the opinions rendered in none of those cases are controlling here. In the Avent case the evidence show that Mrs. Avent stopped her automobile at a stop sign which was 49 feet west of the intersection, and looked in the direction from which the vehicle with which her car subsequently collided came, and entered the crossing without looking again in that direction, although at the stop sign her vision had been obstructed so that she could not see in a southerly direction farther than 300 or 400 feet. The court held that it was for the jury to say whether the defendants were negligent in entering the intersection without looking in the direction from which another motorist was coming, after making a stop at the stop

sign some distance from the intersection. In the Trewolla case the record showed that Trewolla's ambulance was proceeding northwardly on a through highway and was struck on its side by Garrett's automobile which had entered the highway from the east; and the Court stated in its opinion that it clearly appeared from the physical facts and circumstances, including the damage to the right front side of the ambulance or hearse, "that the sole proximate cause of the accident was the fact that the defendant again started his automobile at the edge of the paved highway and drove into the side of the ambulance or hearse as it was passing in front of him."

In Meo v. Miller, supra, the Court found that the overwhelming weight of the evidence was to the effect that the defendant drove onto the highway when the plaintiff's automobile was only 60 to 100 feet away; and, accordingly, a verdict for the defendant was set aside. In Wells v. Bennett, supra, the appellee, according to his own testimony, stopped at a stop sign on the north side of the Capitol Street intersection, looked westwardly and saw the appellant's automobile traveling east at a rate of speed "close to 40 miles an hour," and at that time the Wells automobile was about 100 yards away. The appellee crossed over the center of the four-lane street and struck the appellant's car in the side without ever having looked again to see how near the appellant's car had approached into the intersection.

It can be readily seen that the decisions in the cases mentioned above were based upon facts entirely different from the facts in the case that he have here.

The appellant also complains of the court's refusal to grant the plaintiff's requested instruction No. 8, but we think there was no error in the court's refusal to grant that instruction.

We find no reversible error in the record, and the judgment of the lower court is therefore affirmed.

Affirmed.

*McGehee, C. J.*, and *Lee, Holmes* and *Arrington, JJ.*, concur.